# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## EASTERN DIVISION

CYNTHIA Y. RAINEY,   )
          )
    **Plaintiff,**  )  **Case  No. EDCV 06-00447 AJW**
          )
    **v.**     )  **MEMORANDUM OF DECISION**
          )
MICHAEL J. ASTRUE,   )
**Commissioner of the Social** )
**Security Administration,**  )
          )
    **Defendant.**  )
_____)

   Plaintiff filed this action seeking reversal of the decision of the defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for supplemental security income ("SSI")  benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

## Administrative Proceedings

   Plaintiff filed an application for SSI benefits on June 3, 2002, alleging that she had been disabled since September 1, 2001 due to physical and mental impairments. [ JS 2; Administrative Record ("AR") 80, 119].  Plaintiff's application was denied initially and upon reconsideration. [JS 2; AR 27-48].  On July 1, 2003, plaintiff filed a second application for SSI benefits again alleging onset of disability on September 1, 2001. [JS 2; AR 71].  That application also was denied initially and upon reconsideration. [JS 2]. Plaintiff requested an administrative hearing, which was conducted before Administrative Law Judge Varni

(the "ALJ") on October 4, 2004. [AR 15]. Plaintiff, who was represented by an attorney, testified on her own behalf. [AR 498-509 ]. Testimony also was received from Jessica Fumanti ("Fumanti"), a social worker. [AR 509-515].

On November 30, 2004, the ALJ issued a written decision concluding that plaintiff was not disabled. [AR 15-22]. The ALJ found that plaintiff has not engaged in any substantial gainful activity since 1985. [AR 119]. He further found that plaintiff had the following severe impairments: morbid obesity, diabetes mellitus, an anxiety disorder, and a history of substance abuse. [AR 21 ]. The ALJ determined, however, that plaintiff's impairments, singly or in combination, did not meet or equal an impairment included in the Listing of Impairments (the "Listing"). [AR 21]. See 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ further found that plaintiff retained the residual functional capacity ("RFC") to lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk six hours of an eight-hour work day, and sit for six hours of an eight-hour work day, and therefore that plaintiff could not perform her past relevant work as a fast-food restaurant cashier. [AR 21]. Based on Rule 202.20 of the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, the ALJ determined that plaintiff could perform alternative jobs that exist in significant numbers in the national economy. [AR 21 ]. The ALJ therefore concluded that plaintiff was not disabled at any time up to the date of his decision. The Appeals Council denied plaintiff's request for review. [AR 5 ].

**Background**

At the time the ALJ issued his decision, plaintiff was 46 years old and a single mother of two teenagers. [AR 16]. Plaintiff's primary physical complaints were pain in her right shoulder, lower back, knee, and foot. [AR 97]. Plaintiff alleged that the pain made it harder for her to complete her daily activities. She alleged that she needs help getting dressed and often falls. [AR 128-139]. During the administrative hearing, she said that her back hurt a lot and that sometimes when she bends over, her back gets numb. [AR 506].

The medical records show that on October 18, 2001, shortly after her alleged onset date, plaintiff underwent a physical examination by Joseph P. Klein, an orthopedic surgeon affiliated with the California Department of Rehabilitation ("DOR"), where plaintiff had applied for vocational rehabilitation services. [AR 171-174, 326]. Dr. Klein's diagnoses were (1) right foot and ankle injury, of industrial origin; (2)

chronic cervical, thoracic, and lumbosacral spine strain, and (3) adult onset diabetes. [AR 174]. Dr. Klein opined that plaintiff could sit for up to a full day and stand or walk, in combination, for up to one quarter of a work day. [AR 326]. He also opined that plaintiff could lift and carry up to ten pounds for one quarter of a work day. [AR 326]. Dr. Klein said that plaintiff could not use her right hand for repeated grasping, pulling, pushing, twisting, or fine manipulation. [AR 326]. He concluded that plaintiff could work if she stayed within these functional limitations, and that she is best suited for semi-sedentary work that does not require the use of her right hand. [AR 174].

Dr. Raja, who specializes in internal medicine, treated plaintiff for diabetes and arthritis pain from August 3, 1999 to November 18, 2002. [AR 82, 211-241]. In a residual functional capacity assessment dated June 21, 2002, Dr. Franklin Kalmar, a state agency nonexamining physician, noted that he had spoken by phone with Dr. Raja, who told him that plaintiff had diabetes without significant end organ damage and limited musculoskeletal injury. Dr. Kalmar also said when the requirements of light work were described to Dr. Raja, he agreed that plaintiff could perform light work. [AR 187-188].

In November 2002, Dr. Raja wrote a note addressed "to whom it may concern" stating that plaintiff "will be able to do light duty work." [AR 305]. Plaintiff had been told that she had to obtain such a note releasing her to work in order to qualify for the vocational rehabilitation services for which she had applied. In a December 2002 entry in plaintiff's DOR file, her rehabilitation counselor wrote "Client did obtain doctor's release from Manikanda Raja, M.D., whom [sic] previously indicated she was unable to work, with limitations." [AR 315].

Dr. Kalmar, the nonexamining state agency physician, concluded that plaintiff could perform light work. [AR 181, 187]. Dr. Kalmar deemed plaintiff's subjective allegations partially credible because there was objective evidence in support of her complaints. [AR 187]. Dr. Kalmar also found that plaintiff's impairments did meet or equal a listed impairment. [AR 187]. Dr. Kalmar gave Dr. Raja's opinion more weight than Dr. Klein's because Dr. Klein had only seen plaintiff once shortly after the alleged onset of symptoms, while Dr. Raja had been her treating physician for a longer period of time. [AR 187].

Dr. Alexander Mihelson completed an internal medicine examination and filed a report dated October 16, 2002. Dr. Mihelson concluded that plaintiff was capable of lifting, pulling, pushing, and carrying 20 pounds occasionally and 10 pounds frequently.  [AR 199].

Plaintiff was treated by Dr. John Hunter from May 9, 2003 to August 25, 2004, mainly for diabetes. [AR 333-342, 421-428].

On September 8, 2003, plaintiff underwent an internal medical evaluation by Dr. Steven E. Gerson at the Commissioner's request.  [AR 249-254].  Plaintiff exhibited tenderness in her right knee, left shoulder, right wrist, right hand, right ankle, back, and neck.  Straight leg raising test was negative.[1]  Dr. Gerson commented that plaintiff's examination "is not consistent with acute cervical/lumbar radiculopathy."[2] [AR 252]. He also observed that plaintiff had a mild limp without ataxia. Dr.  Gerson concluded that plaintiff should be able to lift ten pounds frequently, twenty pounds occasionally, and could stand up to six hours during an eight-hour work day.  [AR 252].

Plaintiff also alleges that she suffers from mental impairments. Plaintiff's main mental complaints are anxiety, panic attacks, and depression. [AR 136-137].  During the administrative hearing plaintiff stated that she could not leave the house because of her social anxiety.  [AR 499].

Plaintiff received mental health treatment from the Riverside County Department of Mental Health ("County Mental Health") from August 2001 to December 2003.  [AR 343-416].  Plaintiff initially was treated by a staff psychiatrist, Dr. Doan, who diagnosed panic disorder, agoraphobia, and depressive disorder.  [AR 82, 412].  Dr. Doan prescribed Celexa to control plaintiff's anxiety and panic attacks.  [AR 399-416].  On May 4, 2002, Dr. Doan noted that plaintiff had a panic attack; however, he also noted that plaintiff appeared to be exaggerating symptoms in order to avoid vocational rehabilitation.  [AR 399].

In June 2002, another psychiatrist at County Mental Health, Dr. Elizabeth Roberts, took over plaintiff's care. [AR 392-398]. In her initial report dated July 5, 2002,  Dr. Roberts indicated that plaintiff's

---

[1]    A positive straight leg raising test is indicative of pain produced in the sciatic nerve distribution of the opposite leg, as with lumbar disc rupture on the same side as the pain. Dan J. Tennenhouse, M.D., J.D., F.C.L.M., Attorneys' Medical Deskbook 3d § 11:2 (2004).

[2]    Radiculopathy is a disorder of the spinal nerve roots.  Stedman's Medical Dictionary radiculopathy (27th ed. 2000).

thoughts were ruminative and that she was memory-impaired. In addition, Dr. Roberts noted that there was evidence of depression, anxiety, decreased energy, low social interest, and isolation. [AR 398]. Her diagnoses were generalized anxiety disorder and major depressive disorder. Dr. Roberts opined that plaintiff presently could not work a forty-hour week without decompensating, but added that she "may be able to work part-time when not in deep depression as she is currently." [AR 398]. Dr. Roberts indicated that it was not certain that plaintiff would improve, and that it might take six to nine months to see progress. [AR 397].

In January 2003, plaintiff told Dr. Roberts that her anti-anxiety medication allowed her to manage her computer classes, where previously she would not have been able to do so. [AR 386]. In March 2003, plaintiff told Dr. Roberts and her County Mental Health case workers that she had been assaulted and beaten by her son, who had been taken into custody. Plaintiff said that her son knelt on her chest and hit her repeatedly in the face and chest, rendering her briefly unconscious, and that she suffered two cracked ribs and bruises to her face. [AR 379]. Plaintiff reported that her anxiety and depression had increased after the attack, although she said that she still hoped to get well enough to find a job. [AR 367, 370, 376-377, 379-380].

In a progress noted dated July 11, 2003, Dr. Roberts wrote that plaintiff reported doing well after having discontinued her medication for two weeks. The plan was to monitor plaintiff for recurrence of symptoms and decompensation with the assistance of plaintiff's case manager. [AR 359-360]. Dr. Roberts noted that plaintiff's son's departure from the home had "vastly improved" plaintiff's mood, anxiety, energy, and outlook. [AR 360].

A month later, in August 2003, Dr. Roberts wrote that plaintiff's thought process was clearly organized and that her memory was intact. [AR 353-354]. Plaintiff reported having had a panic attack recently, but no other current symptoms were documented. Dr. Roberts opined that plaintiff would be able to complete a 40-hour work week without decompensating. [AR 354]. Dr. Roberts also noted that plaintiff had told her that she had been working doing laundry and cleaning "under the table." [AR 353].

In September 2003, plaintiff's assigned behavioral health specialist, Fumanti, left a message for Dr. Roberts saying that plaintiff had been placed in a "homemaker plan." [AR 352].

In December 2003, plaintiff's County Mental Health case file was closed because "some of the goals

have been reach[ed], client secured a home and started to work with Vocational Rehabilitation and is getting ready to go back to work." [AR 343].

In February 2004, plaintiff again sought mental health treatment from County Mental Health, where she was treated by Dr. Cathy A. Chance. [AR 429-443, 494-495, 507-508].  The ALJ had before him treatment notes from Dr. Chance through September 2004 [AR 429-443], but plaintiff also submitted to the Appeals Council a post-hearing letter dated February 8, 2006 from Dr. Chance stating that she had seen plaintiff for psychotherapy from February 2004 until March 2005, and then again from September 2005 through the date of her letter. [AR 404-495]. In her initial report dated February 2, 2004, Dr. Chance reported that plaintiff was worried and dysphoric, with diagnoses of panic disorder with agoraphobia, rule out major depression, and rule out dysthymic disorder.  [AR 440-441]. Dr. Chance described plaintiff as "severely dysfunctional," noting that she "is unable to function independently." [AR 442]. On April 30, 2004, Dr. Chance reported that plaintiff had told her that she was doing "good" and had become more independent.  [AR 436].  In July 2004, Dr. Chance stated that plaintiff was still unable to go to the store by herself and exhibited "severe" dysfunction. [AR 432].

In addition to receiving psychiatric treatment at County Mental Health, plaintiff received services from Fumanti.  Fumanti testified that she worked at County Mental Health as the liaison between that agency and the DOR. [AR 510]. Fumanti testified that the DOR "ascertained that [plaintiff] was not employable outside of her home because of the conditions that she suffers with.  So they wrote what's called a Homemaker plan[,] which is we want her to function . . . to her optimal level, and that would allow her to make a home for her daughter." [AR 510]. Fumanti described the homemaker plan as a "last ditch plan" to help a person gain some level of autonomy. [AR 513].[3] Fumanti said she had been working with plaintiff for three years, and she was currently making home visits once a month.[4]  [AR 511-512].  It was her task to help plaintiff overcome barriers to autonomy.  Fumanti mainly attempted to help plaintiff overcome her anxiety in order to help her become more autonomous.  [AR 510-512].  Fumanti testified that "[o]ur goal is . . . to help her get out of the house on her own.  That's not happening."  [AR 511].  She said there had

---

[3]    The DOR indicated that they had chosen this employment goal because plaintiff had difficulties with health and anxiety.  Her orthopedic limitations also contributed to her classification [AR 275].

[4]    The most recent of Fumanti's reports is dated November 8, 2004.

1  been no real improvement in plaintiff's ability to function outside of her home, but that plaintiff made every

2  effort to accomplish the goals that were set for her.  [AR 511, 513].

3  As part of the "Homemaker plan," plaintiff was given a computer so that she could do her personal

4  banking and help her daughter; however, plaintiff had trouble using the computer. [AR 449, 453].  Plaintiff

5  completed a computer training course, and her case was closed in July 2004, about 18 months after it had

6  been reopened.  [AR 446-491].

7  From September 19, 2001 until October 7, 2003, while she also was a patient at County Mental

8  Health, plaintiff received vocational services from the DOR. [AR 265-332].  An initial vocational evaluation

9  report dated December 10, 2001 noted that plaintiff arrived on time and actively participated in vocational

10  planning.  [AR 324].  The report also indicates that plaintiff's vocational success would be impacted by the

11  effects of "limited community and social interaction."  [AR 324].  On April 29, 2002, the DOR

12  rehabilitation counselor, Kristy Harwood ("Harwood"), decided to close plaintiff's file due to the absence

13  of a doctor's note stating that plaintiff could work.  [AR 317].  Harwood based her decision on the report

14  submitted by Dr. Klein, who opined that plaintiff's orthopedic impairments would limit her to a restricted

15  range of sedentary work.  The file also contains a note from Harwood seeking advice from a DOR doctor,

16  who suggested that plaintiff's panic attacks and depressive symptoms would limit her ability to work.  [AR

17  319].

18  In November 2002, plaintiff's DOR file was reopened after she reapplied for vocational services.

19  The file includes Dr. Raja's noted addressed "to whom it may concern," which states that plaintiff could

20  perform "light duty work."  [AR 315].  However, the DOR's staff doctor, Dr. Diamond-Smith, wrote that

21  "symptoms of anxiety, panic, and depression still persist, thus [plaintiff] will probably best consider a part-

22  time position that does not demand diversity of judgment/decision-making, does not require speed for

23  production and where groups of people are present." [AR 313]. The case notes also say that plaintiff "has

24  a strong desire to work. " [AR 312].

25  As part of her DOR vocational rehabilitation program, plaintiff underwent an "External Situational

26  Assessment," pursuant to which she worked a total of 18 hours on location at three job sites. [AR 296-298].

27  Plaintiff's assessor, Joan Showers, stated that plaintiff would need to work part-time in a setting where she

28  would be provided the opportunity to sit or stand when needed and the ability to take frequent breaks.  She

added that the environment would have to be low stress.  [AR 298].

The DOR vocational services staff completed monthly summaries of plaintiff's progress from April 2003 through July 2004.  While plaintiff's motivation, participation, and preparation were mostly rated "excellent," "good," or "satisfactory," she occasionally was rated "marginal" in those areas, and she consistently was noted to exhibit signs of anxiety, depression, and isolation.  [AR 266-272, 466-473].  Plaintiff was classified under the "Homemaker Plan" in June 2003.  [AR 275].

**Standard of Review**

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or if it is based on the application of incorrect legal standards.  Ukolov v. Barnhart, 420 F.3d 1002, 1004 (9th Cir. 2005); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).  Substantial evidence is more than a mere scintilla but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Thomas, 278 F.3d at 954.  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 401 (quoting Consolidated Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)); Thomas, 278 F.3d at 954.  The court is required to review the record as a whole, and to consider evidence detracting from the decision as well as evidence supporting the decision.  Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  Thomas, 278 F.3d at 954 (citing Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

**Statement of Disputed Issues**

Plaintiff contends that the ALJ did not properly consider all of the available medical evidence, including multiple statements from plaintiff's treating physicians, and that the ALJ as failed properly to evaluate the credibility of plaintiff's subjective complaints.

**Discussion**

**Treating source opinions**

Plaintiff contends that the ALJ did not give appropriate weight to the opinions of treating physicians Elizabeth Roberts, M.D. and Cathy A. Chance, Ph.D.  [JS 4].

Where the opinion of a treating or examining physician is uncontroverted, the ALJ must provide

clear and convincing reasons, supported by substantial evidence in the record, for rejecting it.  Where a treating doctor's opinion is controverted by another doctor's opinion, the treating source opinion may be rejected for specific and legitimate reasons that are based on substantial evidence in the record.  Baton v. Commissioner of Social Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Tonapetyan v. Halter, 242 F.3d 1144, 1148-1149 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).

**Dr. Roberts**

Plaintiff contends that the ALJ failed to provide clear and convincing reasons for disregarding the opinion of treating psychiatrist Dr. Elizabeth Roberts. [JS 4].

The ALJ gave "limited weight" to Dr. Roberts's July 5, 2002 report and disability opinion stating that plaintiff could not work a 40-hour week without decompensating. [AR 18; see AR 392-398]. One reason given by the ALJ for disregarding Dr. Roberts's opinion was that it contradicted "all the handwritten notes in the file, which indicated [that plaintiff] had improved with treatment and medication."  [AR 18].  The ALJ concluded that Dr. Doan's treatment notes demonstrated that plaintiff's anxiety had lessened, her mood had improved, and that she was able to be around people. [AR 18].  The ALJ also pointed out that Dr. Doan believed that  plaintiff was exaggerating her symptoms to avoid participation in vocational rehabilitation training. [AR 18, 399].

The ALJ drew unwarranted inferences from Dr. Doan's treatment notes and erroneously relied on those notes to discredit Dr. Roberts's opinion. First, those notes cannot fairly be read to materially contradict Dr. Roberts's July 2002 disability opinion. Dr. Doan provided brief monthly notes incident to medication checks for about six months before plaintiff started seeing Dr. Roberts.  Dr. Doan never assessed plaintiff's functional capacity and never opined that plaintiff could hold a job, nor can it be inferred from his brief progress notes that he considered plaintiff's ability to work. At most, he noted gradual improvement in plaintiff's symptoms of anxiety and depression over a period of months in response to medication.

When plaintiff first saw Dr. Doan in September 2001, he diagnosed anxiety disorder not otherwise specified, rule out social phobia, and rule out malingering or exaggerating for secondary gain. In progress notes from five monthly visits between October 2001 and May 2002, Dr. Doan noted that plaintiff's symptoms had improved somewhat with medication.  For example, in October 2001, plaintiff reported "feel[ing] better. She's been able to take buses, goes to store." [AR 405].  In November 2001, plaintiff felt

"less nervous & starts going out." [AR 403]. In February 2002, plaintiff said she was "doing fine," but Dr. Doan also observed, both then and in a subsequent note, that plaintiff was "histrionic" and "dependent." [AR 400]. In March 2002, plaintiff was "doing fairly well." [AR 400]. Her mood was "stable," and she was "coherent" and "appropriate." [AR 400]. While Dr. Doan's notes suggest that plaintiff was doing better, they do not warrant the inference that plaintiff was sufficiently recovered and unimpaired that she could work a 40-hour week without decompensating. [See AR 399-407].

The ALJ also pointed to Dr. Doan's May 2002 remark that plaintiff appeared to be exaggerating her symptoms. [AR 399]. That comment was made in the context of plaintiff's report to Dr. Doan that

2 days before an appointment with Vocational Rehab Services she had an anxiety spell in store where she felt confused, panic. She says that it was the first after 4-5 years. Pt. says that she can't participate in Voc Rehab and wants to apply [for] SSI. Pt appears to be exaggerating symptoms to avoid participating in Voc Rehab (secondary gain). Pt is histrionic and dependent.

[AR 399]. The ALJ also noted that plaintiff "had a brief association with the [DOR], probably because welfare insisted on it as a condition of further entitlement." [AR 20].

The ALJ's impression that plaintiff was seeking to avoid vocational rehabilitation and that her "brief association" with DOR was a condition of welfare entitlement is inconsistent with the evidence. In September 2001, shortly after plaintiff began treatment at County Mental Health, her case worker "prepared a referral to Vocational Services *at client's request as she is interested in working.* . . ." [AR 405 (emphasis added)]. Plaintiff promptly followed up on the referral by appearing for an appointment at DOR on September 19, 2001. She arrived on time and had her paperwork completed. [AR 327]. Based on the intake interview, the assessor's impression was of a "very disabled woman. It will be necessary to complete an extensive vocational evaluation prior to eligibility. . . . An orthopedic evaluation will also be necessary." [AR 327].

Plaintiff underwent a vocational evaluation, which included the intake interview, "several follow up sessions . . . to observe and evaluate [plaintiff's] functional capacities," an orthopedic evaluation, and vocational testing. [AR 323-325]. During this process plaintiff exhibited "self-direction" and "played an active role in vocational planning." [AR 324]. Her long-term goal was to work part-time as a bank teller.

[AR 324]. Vocationally relevant findings included limited community involvement and social interaction and symptoms of social withdrawal, anxiety, self isolation, and depression "partially controlled by medication." [AR 323-324].

Two nonexamining DOR physicians, Dr. Clymer and Dr. Diamond-Smith, reviewed plaintiff's file, including the orthopedic evaluation report by Dr. Klein, the DOR examining orthopedist.  Dr. Clymer endorsed Dr. Klein's conclusion that plaintiff could do only sedentary work with the opportunity to occasionally stand and move about, along with other limitations. [AR 320].  Dr. Diamond-Smith noted that plaintiff's panic attacks and depressive symptoms were only partially controlled with medication and suggested that plaintiff might be able to tolerate part-time involvement in low-stress situations which do not demand diverse judgements or decision-making, and that she should avoid situations involving speed for production or meeting rigid deadlines. [AR 319].

In April 2002, about six months after she applied for vocational rehabilitation, plaintiff was advised that her DOR case was closed because she had not provided

a doctor's note indicating that you were able to participate in vocational services (either training or employment) . . .  At this time you are not stable medically and need to get that in order. . . . [¶] You are welcome to re-apply for DOR services once you have obtained a doctor's note indicating that you are medically stabilized and can participate in vocational services.

[AR 317].

Thus, when Dr. Doan speculated in May 2002 that plaintiff was exaggerating her symptoms to avoid vocational rehabilitation, plaintiff's vocational case already had been terminated. She had sought and been denied vocational rehabilitation services because she was not "medically stable" and had not produced a doctor's note releasing her to work.  With this avenue apparently foreclosed, plaintiff applied for SSI benefits in June 2002, and her application was denied through the reconsideration level.  When asked by a County Mental Health case worker in August 2002 if she was willing to work, plaintiff replied "that when she tried to be retrained the vocational services told her that she was too ill to go back to work, but SSA told her that she can go back to work and denied her help." [AR 389].

About six months later, in November 2002, plaintiff reapplied for DOR vocational rehabilitation

11

services. Although it is possible that plaintiff had to obtain vocational rehabilitation as a condition for receiving welfare benefits, as the ALJ suggested, there is no evidence that was the case.  Indeed, Harwood, plaintiff's rehabilitation counselor at the DOR,  remarked in her intake interview notes that plaintiff had been denied SSI benefits and had "a strong desire to work." [AR 316].  Harwood also wrote that she informed plaintiff that "[she] MUST provide doctor's release in order for us to provide any assistance." [AR 316].  Plaintiff obtained the "light duty" clearance note from Dr. Raja the very next day, but that note consists of a sentence written on a prescription pad without any explanation of what is meant by "light duty," what examination findings he relied on, or whether Dr. Raja had considered plaintiff's mental condition as well as her physical condition. [AR 305].

Dr. Clymer, a nonexamining DOR staff physician, concurred with Harwood's summary of plaintiff's orthopedic limitations as reflected in the DOR file, namely, that plaintiff was precluded from performing her "usual type of work" and was restricted to "sedentary work, light lifting (no more than 10 lobs. to waist) for half day" with a "supportive employer" who could accommodate her restrictions and her "medical care schedule." [AR 315].  Plaintiff's work environment also "needs to accommodate use of good chair and mixed activities." [AR 315].

Dr. Dimond-Smith, the DOR nonexamining staff psychiatrist, noted that "[s]ymptoms of anxiety, panic and depression still persist," thus plaintiff was probably best-suited to a part-time position that did not demand "diversity of judgement/decision-making," speed for production, or contact with groups of people. Dr. Dimond-Smith also observed that plaintiff's histrionic and dependent traits meant that she would need to receive some "measurable expectations" and "feedback that [she] has carried out the specific task." [AR 313].  Plaintiff was described as  actively involved the eligibility determination process. [See AR 314]. She was found eligible for services because she was "seriously impacted" in the areas of mobility, self-care, work skills, interpersonal skills, and work tolerance. [AR 281-282, 313].

Shortly after plaintiff reapplied for DOR vocational services, Dr. Roberts referred plaintiff to County Mental Health case management services for support with vocational services and SSI assistance. [AR 384]. Plaintiff's County Mental Health case worker wrote that plaintiff "doesn't want to apply again for SSI that they denied her before and she believes that not to be able to go to work would stop her from getting better. [Plaintiff] said she wants to able to go back to work and make a decent living for her and her children." [AR

384].  In February 2003, plaintiff told the same case worker "how much her life had changed since she started to go to the vocational services.  Client said she [has] been able to stay in rooms with other people for long periods. Client seems happy and proud of herself." [AR 384].

On February 4, 2003, plaintiff's DOR rehabilitation counselor wrote that plaintiff had "a strong desire to work, but given her physical and psychiatric limitations we are unsure of what type of vocational goal she can consider." [AR 312]. Plaintiff was authorized to undergo the External Situational Assessment ("ESA") to expose her to working onsite at different jobs. [AR 294-304].

In June 2003, it was noted that plaintiff was making "marginal progress [in] participating" in her ESA due to injuries from the assault by her son and ensuing legal issues, but plaintiff was "good in her motivation and satisfactory in preparation." [AR 273, 309].  For the most part, monthly vocational services reports rated plaintiff's participation, motivation, and preparation as excellent, good, or satisfactory. [AR 266-273]. Plaintiff ultimately spent 18 hours working, dividing her time between three job sites. [AR 295]. The final ESA report concluded that plaintiff was willing to work and had basic work skills and abilities, such as the ability to be prompt, understand and follow verbal instructions, interact appropriately with others, and display appropriate judgment. [AR 298].  Nonetheless, the ESA assessment concluded that plaintiff would require part-time work in a low-stress setting which allowed her to sit and stand as needed and take frequent bathroom breaks (due to the side-effects from her medication). [AR 296-298].

In September 2003, Harwood wrote that plaintiff said that Dr. Roberts wanted her to go to work. Harwood left Dr. Roberts a message saying "that DOR didn't think that was feasible at this time due to her ESA showing she didn't have the sta[mina] to perform work long enough," and that plaintiff needed to "attend Phoenix Program to help with socialization and getting herself to the point to be in a setting for 3-4 hours 2 or 3 days per week, before DOR can consider employment.  Her current IPE [individualized plan for employment] is for Homemaker Plan." [AR 308-309].    Plaintiff's IPE states that plaintiff was to be evaluated for provision of a home computer, desk and chair to allow her to interact with the community and take classes via the internet, increase her basic computer skills, help her teenage daughter with homework, and pay bills.  Plaintiff also agreed to participate in the Phoenix Program, a socialization program paid for by Medi-Cal for mental health clients with social phobias, and to work with San Jacinto Vocational Services.  She also was to be given assistance reapplying for SSI benefits. [AR 265-276].

Plaintiff did receive help with her SSI benefits application from Fumanti, who wrote in June 2003 that plaintiff was "depressed because she is not qualified to work at present. Needs to apply [for] SSI." [AR 366]. Fumanti noted in October 2003 and November 2003 that plaintiff "desperately wants to get better & become employed" and "remains motivated to successfully complete IPE and gain some type of employment." [AR 344, 346].

The extensive evidence from DOR and County Mental Health regarding plaintiff's participation in vocational services refutes Dr. Doan's suggestion that plaintiff was motivated to avoid vocational rehabilitation. That evidence, coupled with Fumanti's testimony that plaintiff made every effort to meet the goals set for her, shows that plaintiff diligently pursued and participated in vocational rehabilitation services. Despite giving plaintiff high marks for motivation, participation, and preparation, the DOR concluded that her physical and mental limitations precluded her from employment outside the home. Therefore, the negative inference that Dr. Doan drew, and that the ALJ adopted, is not substantial evidence supporting the ALJ's rejection of Dr. Roberts's disability opinion.

Another reason given by the ALJ for rejecting Dr. Roberts's opinion was that later notes by Dr. Roberts contradict her July 2002 opinion. [AR 18; JS 9]. The ALJ pointed out that on July 5, 2002, when she prepared her disability report, Dr. Roberts had only seen plaintiff once. In contrast, Dr. Roberts's August 2003 opinion that plaintiff could maintain concentration, sustain repetitive tasks for an extended period, and adapt to new or stressful situations was based on more than a year of treatment, leading the ALJ to conclude that Dr. Roberts's later report should be given more weight than her earlier report. [See AR 19].

An ALJ can give little weight to a treating physician's opinion if the opinion is not supported by his or her treatment notes. See Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003)(holding that the contradicted opinion of a treating doctor was properly rejected as not supported by the doctor's treatment notes). Dr. Roberts's August 2003 opinion was different from her July 2002 opinion, but those opinions are not necessarily contradictory because plaintiff's condition could have improved over time. Dr. Roberts's July 2002 disability opinion is consistent with her subsequent notes indicating that plaintiff continued to complain of anxiety and depression, especially in response to stressors involving her children's problems and her financial situation, yet she also reported some improvement in response to medication, attending a wellness group, and a reduction in her external stressors. In November 2002, for example, Dr. Roberts

noted that plaintiff was able to leave the house to attend a court hearing with her son. [AR 387].  In January 2003, Dr. Roberts said that plaintiff was "getting ready for new job" and "very happy about her success." [AR 384]. The ALJ characterized Dr. Roberts's reference to plaintiff's "new job" as inconsistent with her July 2002 disability opinion [AR 18], but Dr. Roberts appears to have been under a misapprehension. Nothing in the record indicates that plaintiff was preparing for a new job; rather, she was in the midst of her second round of vocational rehabilitation and was preparing for her ESA placement, where she sampled three different jobs to assess her ability to perform them.  [See, e.g., AR 383 (January 6, 2003 note stating that County Mental Health case worker met with plaintiff to discuss the purpose and benefits of ESA and to obtain her agreement to request an ESA placement); AR 384 (February 1, 2003 note describing plaintiff as "happy and proud" about positive changes from her participation in the vocational services program)].

After plaintiff's son assaulted her in March 2003, she experienced a setback with recurrence of symptoms. [AR 377, 379]. In a report dated July 14, 2003, Dr. Roberts indicated that one of her goals for plaintiff for the next six months was to assure that plaintiff would not make any suicide attempts or engage in self-destructive behavior, suggesting that she was not convinced that plaintiff's condition was completely stable. [AR 359].

On August 27, 2003, plaintiff told Dr. Roberts that she had experienced a panic attack in mid-August.  She also said she had been working "under the table" taking in laundry and doing cleaning so she could get her car running.  Plaintiff said she wanted help from DOR to get a good job, but that she had been told she first had to be denied by SSI, which already had occurred. Dr. Roberts put in a call to the DOR rehabilitation counselor for clarification.  Dr. Roberts observed that plaintiff had a "bright, full affect," exhibited good energy and motivation, and complained only of increased irritability during her menstrual cycle and occasional panic attacks. [AR 352-353]. Dr. Roberts concluded that plaintiff's symptoms were controlled with medication at that point, and that she could work a 40-hour week without decompensating. [AR 352-354].

The ALJ erroneously treated Dr. Roberts's July 2002 and August 2003 opinions as inconsistent and mutually exclusive. [See AR 18-19]. Dr. Roberts's August 2003 conclusion that plaintiff's condition had improved with medication to the point that she could work a 40-hour week without decompensating does not necessarily undermine the validity of her July 2002 opinion that plaintiff was disabled.  To the contrary,

Dr. Roberts's notes indicate that plaintiff's symptoms slowly improved during that period, until Dr. Roberts concluded that plaintiff could tolerate a 40-hour work without decompensating. Dr. Doan's brief medication progress notes do not provide a valid basis for discrediting Dr. Roberts's July 2002 opinion. The ALJ was entitled to consider the significance of Dr. Roberts's August 2003 opinion that plaintiff could tolerate a 40-hour work week without decompensating, but the reasons the ALJ gave for rejecting Dr. Roberts's July 2002 opinion are not legitimate and are not supported by the record as a whole.

### Dr. Chance

In February 2004, plaintiff began seeing Dr. Chance, a psychologist who also was affiliated with County Mental Health. [AR 429-443, 507-508]. In her initial intake assessment dated February 6, 2004, Dr. Chance diagnosed plaintiff with panic disorder with agoraphobia, rule out major depression, rule out dysthymic disorder.  [AR 440].  She assigned plaintiff a current and past year Global Assessment of Function ("GAF") score of 50 [AR 440], signifying serious symptoms or a serious impairment in social, occupational, or school functioning, such as the absence of friends or the inability to keep a job.[5]  Dr. Chance also described plaintiff as "severely dysfunctional." [AR 442]. In July 2004, Dr. Chance gave plaintiff a current GAF of 60, denoting moderate symptoms, such as flat affect or occasional panic attacks, or moderate difficulty in social, occupational, or school functioning, such as having few friends or conflicts with peers or co-workers. DSM-IV Multiaxial Assessment 32. Plaintiff was still "severely dysfunctional" and "still [had] considerable difficulty functioning independently." [AR 431-432].

Citing inconsistencies in Dr. Chance's reports, the ALJ gave little weight to Dr. Chance's opinion. [AR 19-20]. The ALJ concluded that Dr. Chance's September 8, 2004 report, in which she indicated that plaintiff could not maintain attendance more than 2 to 3 days at a stretch because of anxiety [AR 430], "is

---

[5]    The GAF score is a "multiaxial" assessment that reflects a clinician's judgment of a patient's overall level of functioning by asking the clinician to rate two components: the severity of a patient's psychological *symptoms,* or the patient's psychological, social, and occupational *functioning*.  The GAF score is the lower of the symptom severity score or the functioning severity score. A GAF score of 41 through 50 denotes serious symptoms, such as suicidal ideation or severe obsessional rituals, or any serious impairment in social, occupational, or school functioning, such as the absence of friends or the inability to keep a job. See The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") Multiaxial Assessment (4th ed. 1994)(revised 2002); see also Morgan v. Commissioner of Soc. Sec. Admin., 169 F.3d 595, 598 n.1 (9th Cir. 1999); Sousa v. Chater, 945 F.Supp. 1312, 1319 n.7, 1320 n.8, 1322 n.9 (E.D. Cal. 1996), rev'd on other grounds,143 F.3d 1240, 1245 (9th Cir. 1998); see also Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004).

of little value since it is inconsistent with other notes of record." [AR 19].

As previously noted, the ALJ can give little weight to a treating physician's opinion if the opinion is not supported by his or her notes.  See Connett, 340 F.3d 875.  The ALJ, however, did not specify which notes contradicted Dr. Chance's opinion.  The ALJ said that the results of plaintiff's mental examination by Dr. Chance were within normal limits, and that those findings contradicted her opinion.  [AR 19].  In February 2004 and July 2004, however, Dr. Chance stated that plaintiff was "severely dysfunctional." [AR 442 , 432].  Furthermore, throughout Dr. Chance's monthly progress notes, she reported that plaintiff was anxious, stressed, and had trouble functioning.  [See AR 430-439].  Thus, Dr. Chance's treatment notes actually support her opinion.

Regarding the GAF score of 50 that Dr. Chance assessed in February 2004, the ALJ wrote:

The GAF is based solely on the claimant's assertions and is inconsistent with her actual functioning in raising her children.  This claimant has had no attachment to work in the past 19 years, has been supported on welfare, and she faces the loss of that income since her remaining child at home is age 16.  The claimant's assertion of a complete inability to function either in or out of the home is an exaggeration and is unsupported by any document of record.  The fact she has some kind of social worker who comes to her house once a month establishes no lack of function  and is based solely on the claimant's recent assertions of inability to function.

[AR 20].[6]

The "evidence" cited by the ALJ provides scant support for his rejection of the Dr. Chance's opinion, and specifically the GAF score of 50 she assigned plaintiff.   [AR 20]. To begin with, what little evidence there is relevant to plaintiff's "actual functioning" in raising her children reflects a significant level of dysfunction. By way of background, plaintiff told her County Mental Health providers that both of her parents physically abused her, her father was an alcoholic who died when she was 12, and that she felt rejected by her mother. [AR 409]. Both plaintiff's daughter, who was 13 when plaintiff first sought mental

---

[6]    Plaintiff testified that she did not work at all between 1985 and 2003, and that she received aid for my children and "did the best I could with it." [AR 505; see AR 322 (stating that plaintiff received TANF payment (Temporary Aid to Needy Families) of  $495 per month)]. During that time, her son received SSI benefits [AR 327], and she lived in subsidized housing. [See AR 391].

health treatment in 2001, and her son, who was then 15, appear to have experienced significant behavioral and other problems. Plaintiff had to go to court on her daughter's behalf in May 2003 for an unspecified reason, and her daughter was not attending a regular school at one point.  Plaintiff reported that her son, whom she described to her treatment providers as disruptive, delinquent, and a source of great stress, was on medication and had diagnoses of attention deficit hyperactivity disorder and bipolar disorder. She said that he received SSI disability benefits, and that he required an IEP (an individualized education plan for children with learning disabilities).  It appears that at some point he had refused to go to school.  He had been charged with theft of an automobile even before being incarcerated, at age 17, for assaulting and injuring plaintiff.  He also apparently was implicated in vandalism and property damage. Plaintiff told Fumanti that she was in danger of having her electricity shut off for nonpayment when she received a bill of $6,000 from Juvenile Hall, of which she was responsible for $600. Plaintiff's son was released from detention but was not allowed to return home, and this caused plaintiff a mixture of regret and relief. He was to be evaluated by a psychologist. [See AR 327, 361-362, 367-368, 370, 372-373, 376-377, 379, 388, 392-393, 406, 409].  This evidence does not suggest that plaintiff's "actual functioning in raising her children" was so successful as to be "inconsistent" [AR 20] with the GAF score of 50 assigned by Dr. Chance or otherwise weighs in favor of finding that plaintiff was not disabled.

Second, plaintiff's reliance on public assistance for needy families—what the ALJ describes as her having been "supported on welfare"—is not a legitimate reason for the ALJ to reject the GAF score that Dr. Chance assigned. The GAF score is a "multi-axial" assessment that takes into account a plaintiff's psycho-social and environmental stressors in addition to mental disorders and general medical conditions.  Dr. Chance gave plaintiff a GAF score of 50 partly because she experienced "assault by son, *financial problems*, family problems." [AR 440 (italics added)].  Furthermore, the ALJ's assumption that plaintiff was unmotivated to work because she was dependent on public assistance to support her children is speculative and is contradicted by evidence that she diligently attempted to undergo vocational rehabilitation.[7] See generally McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002)( "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject

_____

[7]    Furthermore, it makes no sense to penalize an SSI claimant for receiving public assistance when SSI benefits are available only to those who, because of their limited means, are more likely to need public assistance.

a treating physician's opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion.*")(quoting Morales v. Apfel, 225 F.3d 310, 317 (3d Cir.2000)).

Third, the ALJ's insistence that "claimant's assertion of a complete inability to function either in or out of the home is an exaggeration and is unsupported by any document of record" mischaracterizes the record. For one thing, plaintiff did not assert a complete inability to function; rather, she alleged that anxiety and panic disorders precluded her from working outside the home and restricted (but did not eliminate her ability to function inside the home and perform daily activities. Moreover, as is evident from the foregoing discussion, the record contains many documents corroborating plaintiff's allegations regarding her impairments and functional limitations, including treating notes from plaintiff's doctors and case management notes from her County Mental Health and DOR case workers.

Fourth, that plaintiff "has some kind of social worker who comes to her house once a month" [AR 20] is not trivial. The social worker, Fumanti, was a County Mental Health case worker whose job was to work with clients on vocational rehabilitation and who testified that, based on her three-year history of working closely with plaintiff with the goal of facilitating retraining and employment, plaintiff could not function adequately outside the home and had complied with what was required of her in connection with vocational rehabilitation. [See AR 510-513].

In addition, there is post-hearing evidence from Dr. Chance, who submitted a letter dated February 8, 2006 to the Appeals Council stating that she had continued to treat plaintiff for another six months after the October 2004 hearing, and again from September 2005 through the date of her letter. [AR 494-495]. This evidence was not before the ALJ, but it is properly part of the record in this case. See Ramirez v. Shalala, 8 F.3d 1449, 1452 (9th Cir. 1993) (stating that a reviewing court "consider[s] on appeal both the ALJ's decision and the additional material submitted to the Appeals Council")(citing Bates v. Sullivan, 894 F.2d 1059, 1063-64 (9th Cir.1990) and 20 C.F.R. § 404.970(b)). Dr. Chance said that plaintiff had a diagnosis of panic disorder with agoraphobia, making it "very difficult to venture outside her home, particularly without the accompaniment of a family member," and that plaintiff had "worked diligently to overcome this difficulty, with some limited success." [AR 494]. Plaintiff also had "considerable difficulty going to places with large numbers of people." [AR 494]. Dr. Chance said that she did "not believe that

[plaintff] can get or hold a full-time job in the competitive job market." [AR 494]. Dr. Chance anticipated only limited improvement with continued therapy, and she noted that stress "makes her condition much worse. . . ." [AR 494]. She gave plaintiff a current GAF score of 55 (serious symptoms or impairment) and a past year GAF score of 60 (moderate symptoms or impairment). [AR 494]. This evidence undermines the ALJ's reasons for rejecting Dr. Chance's opinion.

For the foregoing reasons, the ALJ erred in failing to provide legally sufficient reasons, supported by substantial evidence in the record, for discrediting the opinion of Dr. Chance.

**Information from other sources**

Plaintiff contends that the ALJ did not give appropriate weight to Fumanti's testimony. As a behavioral health specialist employed by the County, Fumanti is an "other source." 20 C.F.R. § 416.913(a)&(d)(defining "acceptable medical sources" and "other sources"). Information from other sources cannot establish the existence of a medically determinable impairment. However, other sources, including "public and private social welfare agency personnel" and "rehabilitation counselors," may be "important" or "valuable" sources of evidence because these sources may have close contact with, and special knowledge of, the individual, along with the "personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over time." Social Security Ruling ("SSR") 06-03p, at *2-*3[8]; see 20 C.F.R. § 416.913(a),(d)(1)&(e).

The factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d), which are used to evaluate evidence from acceptable medical sources, "represent basic principles that apply to the consideration of all opinions" from both acceptable medical sources and other sources, medical or non-medical. SSR 06-03p, at *4. For non-medical other sources such as counselors and social workers, it is appropriate to consider such factors as the nature and extent of the relationship between the source and the claimant, the source's qualifications and area of specialty or expertise, the degree to which the source supports his or her opinion

---

[8]     Social Security Rulings are agency rulings published in the Federal Register under the authority of the Commissioner, and they are binding on all components of the Social Security Administration. Zebley v. Sullivan, 493 U.S. 521, 531 n.9 (1990); Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20 C.F.R. § 422.406(B)(1). While those rulings do not have the force of law, they constitute the Commissioner's administrative interpretations of the Social Security statutes and regulations. Paxton v. Secretary of Health and Human Services, 856 F.2d 1352, 1356 (9th Cir. 1988). Accordingly, the court defers to Social Security Rulings unless they are plainly erroneous or inconsistent with the Social Security Act or regulations. Paxton, 856 F.2d at 1356.

with relevant evidence, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion.  See SSR 06-03p, at *5.  Using these factors as a guide, an opinion from a non-medical other source who has "seen the claimant in his or her professional capacity may, under certain circumstances . . . outweigh the opinion of from medical source, including a treating source." SSR 06-03p, at *6.  This could occur, for example, where the non-medical other source has seen the individual more often, has greater knowledge of the individual's functioning over time, has better supporting evidence, and is more consistent with the evidence as a whole.  SSR 06-03p, at *6.

The ALJ said that he did not find Fumanti's testimony credible and gave it little weight. [AR 20]. The ALJ did not indicate that he considered any of the relevant factors in assessing the credibility of Fumanti's testimony. The ALJ did not refer to other evidence that contradicted the opinion of Fumanti nor explain why he deemed her testimony not credible.  Fumanti testified from her firsthand experience in her professional capacity as plaintiff's assigned case worker for more than three years. Her testimony was relevant to assess the severity of plaintiff's impairments and whether plaintiff can work. Fumanti did not attempt to offer a medical diagnosis or opinion.  Had she done so, the ALJ could have rejected that testimony because Fumanti is not an acceptable medical source. Since, however, Fumanti worked closely with plaintiff in a professional capacity for and made monthly home visits to plaintiff for part of that time, the ALJ erred in rejecting Fumanti's testimony about plaintiff's work-related functional abilities without articulating legitimate reasons for doing so.

**Credibility of plaintiff's subjective complaints**

Plaintiff contends that the ALJ did not properly support his rejection of the alleged severity of plaintiff's subjective complaints.

Once a disability claimant produces evidence of an underlying physical or mental impairment that is reasonably likely to be the source of her subjective symptoms, the adjudicator is required to consider all subjective testimony as to the severity of the symptoms.  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991) (en banc); see also 20 C.F.R. §§ 404.1529(a), 416.929(a) (explaining how pain and other symptoms are evaluated).  Although the ALJ may then disregard the subjective testimony he considers not credible, he must provide specific, convincing reasons for doing so. Tonapetyan, 242 F.3d at 1148; see also Moisa, 367 F.3d at 885 (stating that in the absence of evidence

of malingering, an ALJ may not dismiss the subjective testimony of claimant without providing "clear and convincing reasons").  The ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." Moisa, 367 F.3d at 885; see Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997) (enumerating factors that bear on the credibility of subjective complaints); Fair v. Bowen, 885 F.2d 597, 604 n.5 (9th Cir. 1989)(same).  If the ALJ's assessment of the claimant's testimony is reasonable and is supported by substantial evidence, it is not the court's role to "second-guess" it. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

The ALJ concluded that plaintiff's testimony "credibly establishes no greater disability" than the limitation to "object oriented, unskilled, entry level work" he imposed. [AR 20]. The ALJ did not specify any reasons to support that finding.  The ALJ mentioned facts elsewhere in his opinion that might have influenced his credibility determination, such as his negative view of plaintiff's work history and welfare dependency, but he did not reference that evidence in connection with his credibility assessment or specify what role those facts played in his evaluation of plaintiff's subjective testimony.  That alone makes his credibility finding deficient. See Burch v. Barnhart, 400 F.3d 676, 680 (9th 2005)("The ALJ must specify what testimony is not credible and identify the evidence that undermines the claimant's complaints—general findings are insufficient.")(internal quotation marks and alteration omitted).

Elsewhere in his decision, the ALJ referenced Dr. Doan's suggestion that plaintiff was exaggerating her complaints to avoid vocational rehabilitation, but the ALJ did not make a finding that plaintiff was malingering, and in any case the negative inference that Dr. Doan drew was at odds with the plaintiff's vocational services records and Fumanti's testimony.  Even if there is affirmative evidence that the plaintiff was malingering, the ALJ still must make credibility findings, but his reasons need not be "clear and convincing." Moisa, 367 F.3d at 885.[9]

As noted above, the ALJ rejected the GAF score of 50 assigned by Dr. Chance in part because he inaccurately asserted that her subjective allegations were "unsupported by any document of record." [AR

---

[9]     After Dr. Roberts issued her August 2003 report stating that plaintiff could work a 40-hour weeks, there are case management notes indicating that one of plaintiff's doctors told her case workers by phone that plaintiff was malingering and could work. [AR 348]. Those notes do not identify Dr. Roberts by name or unambiguously establish her as the source of those comments, and Dr. Roberts's own notes do not include a finding of malingering.

20]. That finding was relevant to plaintiff's credibility, albeit in the context of assessing Dr. Chance's opinion. The ALJ can consider the presence or absence of objective evidence corroborating the alleged severity of a claimant's subjective complaints. The ALJ may not, however, "reject a claimant's subjective complaints *based solely* on a lack of objective medical evidence to fully corroborate the alleged severity of pain." Bunnell, 947 F.2d at 343. The absence of medical findings to support the degree of severity alleged "is just one factor to be considered in evaluating the credibility of the testimony and complaints." Bunnell, 947 F.2d at 345 (citation omitted).

As previously noted, the record contains objective evidence corroborating the alleged severity of plaintiff's subjective complaints, such as Dr. Roberts's July 2002 disability opinion and Dr. Chance's reports stating that plaintiff is not able to leave the house without assistance and is severely dysfunctional. [AR 397-398 432]. Accordingly, to the extent that the ALJ rejected plaintiff's subjective allegations in part because there was no objective evidence to corroborate them, that was not a valid reason.

The ALJ also mentioned that Dr. Roberts reported that plaintiff told her she was working "under the table" in August 2003, and that was a reason Dr. Roberts gave for concluding that plaintiff could work. Plaintiff testified that she had not worked under the table, but the ALJ concluded that it would be highly unlikely that the treating physician would have "imagined that or reported it" had the information not come from plaintiff. [AR 20]. The ALJ permissibly resolved that conflict against plaintiff, but since there is no evidence plaintiff worked under the table before (or after) that time, that one factor alone is not sufficient to discredit plaintiff's allegations regarding the entire period of alleged disability. In addition, Dr. Chance's post-hearing reports show that plaintiff continued to receive treatment after the hearing and that Dr. Chance believed that plaintiff was working "diligently" to overcome her symptoms of agoraphobia and panic attacks but nonetheless could not work a full-time job.

The ALJ also pointed to plaintiff's prior work history, again in the context of rejecting Dr. Chance's GAF score. [AR 20]. A poor work history can indicate that the claimant is not credible, or it can support an inference that the plaintiff's testimony is truthful. Schall v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998)( noting that "claimant's failure to work might stem from her inability to work as easily as her unwillingness to work"). The ALJ inferred from plaintiff's lack of work history that she presently was unwilling to work rather than that she lacked the ability to work, but the County Mental Health and DOR staff who evaluated

plaintiff for vocational services and worked with her quite intensively for an extended period were convinced that her desire and motivation to work were strong.[10] The ALJ did not provide clear and convincing evidence to suggest that the correct inference from the poor work history is that plaintiff is unwilling to work.

Finally, the ALJ's decision suggests that he rejected plaintiff's subjective complaints in part due to her daily activities. [See AR 20]. The ALJ pointed out that plaintiff rode the bus, shopped with family, took the dial-a-ride van with her daughter, saw her therapist twice a month, attended computer classes through vocational rehabilitation, and participated in vocational rehabilitation services, which included her working at job sites (for a total of 18 hours over about two months).

A claimant's daily activities can contradict subjective complaints or assertions of an inability to work. See Burch, 400 F.3d at 681 ("[I]f a claimant engages in numerous daily activities involving skills that could be transferred to the workplace, the ALJ may discredit the claimant's allegations upon making specific findings relating to those activities.").  However,  just because a claimant can accomplish some daily activities does not mean that those activities are transferable to the work place. See Vertigan v. Halter, 260 F.3d 1044, 1049-1050 (9th Cir. 2001) (noting that a claimant need not be "'utterly incapacitated' in order to be disabled," and that "daily activities  are not necessarily transferable to the work setting" because "[a] patient may do these activities despite pain for therapeutic reasons, but that does not mean she could concentrate on work despite the pain or could engage in similar activity for a longer period given the pain involved")(quoting Fair, 885 F.2d at 603).

Therefore, the fact that plaintiff can perform the limited daily activities she acknowledged in her disability reports and testimony does not justify rejecting her subjective allegations of disabling anxiety, panic attacks, and depression. In fact, since the uncontradicted evidence indicates that plaintiff needs the aid of her family do to do many of these tasks [see AR 499-504, 494, 510-513], her daily activities do not detract from her the credibility of her subjective mental complaints.  Furthermore, the fact that the DOR concluded that plaintiff could not meet the demands of outside employment and classified her as a homemaker buttresses the credibility of her allegation that she is not capable of working outside of her

---

[10]    Of course, that may not always have been the case.  Plaintiff may not have been motivated to work earlier in her life. The question, however, is what her prior work history says about her ability and motivation to work during the period for which she could recover SSI benefits.

1  home. [AR 275].

2  **Remedy**

3  The choice whether to reverse and remand for further administrative proceedings, or to reverse and

4  simply award benefits, is within the discretion of the court. <u>See</u> <u>Harman v. Apfel</u>, 211 F.3d 1172, 1178 (9th

5  Cir.) (holding that the district court's decision whether to remand for further proceedings or for payment of

6  benefits is discretionary and is subject to review for abuse of discretion), <u>cert. denied</u>, 531 U.S. 1038

7  (2000). The Ninth Circuit has observed that "the proper course, except in rare circumstances, is to remand

8  to the agency for additional investigation or explanation." <u>Moisa</u>, 367 F.3d at 886 (quoting <u>INS v. Ventura</u>,

9  537 U.S. 12, 16 (2002) (per curiam)).   A district court, however,

10  should credit evidence that was rejected during the administrative process and remand for

11  an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for

12  rejecting the evidence; (2) there are no outstanding issues that must be resolved before a

13  determination of disability can be made; and (3) it is clear from the record that the ALJ

14  would be required to find the claimant disabled were such evidence credited.

15  <u>Benecke v. Barnhart</u>, 379 F.3d 587, 593 (9th Cir. 2004) (citing <u>Harman</u>, 211 F.3d at 1178). The <u>Harman</u> test

16  "does not obscure the more general rule that the decision whether to remand for further proceedings turns

17  upon the likely utility of such proceedings." <u>Harman</u>, 211 F.3d at 1179; <u>see</u> <u>Benecke</u>, 379 F.3d at 593

18  (noting that a remand for further administrative proceedings is appropriate "if enhancement of the record

19  would be useful").

20  Plaintiff requested a remand for further proceedings [JS 19], and that is the appropriate remedy

21  because it is not clear that the ALJ would be required to find plaintiff disabled if the evidence is properly

22  credited and the record is fully developed to resolve outstanding issues, such as whether Dr. Roberts

23  believed plaintiff was malingering.

24  **Conclusion**

25  For the reasons stated above, the Commissioner's decision is not supported by substantial evidence

26  and is not free of legal error.   Accordingly, the Commissioner's decision is **reversed** and the case is

27  remanded for further administrative proceedings consistent with this memorandum of decision.

28  **IT IS SO ORDERED.**

DATED:   August 16, 2007

/ s /

_____
ANDREW J. WISTRICH
United States Magistrate Judge